# EXHIBIT B

## LICENSE AGREEMENT

This License Agreement (the "Agreement") is made this ⊌ day of September, 2012 (the "Effective Date") by and between **Fender Musical Instruments Corporation** (the "**Licensor**") and **Umerco Clothing Inc. DBA Dragonfly Clothing** (the "**Licensee**") for the purposes of licensing trademarks owned by Licensor to be used in conjunction with Licensed Products, as described below:

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and value of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **Grant of License and Use of License by Licensee.** In accordance with the terms set forth herein, Licensor grants to Licensee and Licensee takes from Licensor the non-exclusive, limited, non-transferable, and non-sub-licensable right and license to use throughout the territories identified on **Schedule A** (the "Territory") the trademarks owned by Licensor identified on **Schedule B,** in conjunction with the manufacturing, sourcing, advertising, marketing, distribution, and/or sale of the Licensed Products (as defined below) in the channels of distribution indentified on **Schedule C** (the "Approved Channels") during the Term (as defined below). Licensee agrees that it shall not manufacture, source, advertise, market, distribute and/or sell any products containing any of Licensor's trademarks that have not been approved in advance by Licensor. Licensee further agrees to sell the Licensed Products only in the Approved Channels.

2. **Licensed Products.** Licensed Products, for the purpose of this Agreement, shall be the specific apparel items identified on **Schedule D** that contain Licensor's trademarks in their design and/or on the label, container, packaging and/or advertising materials. Licensee agrees that with respect to all Licensed Products that (a) Licensor shall approve the designs and trademark usage on such Licensed Products in advance, (b) such Licensed Products shall be manufactured by Licensee or third parties approved in advance by Licensor and in accordance with Licensor's style and quality requirements, (c) such Licensed Products shall be sold by Licensee only in the Approved Channels, and (d) that such Licensed Products shall contain Licensor's approved, licensed trademarks in their design or on the label, container, packaging and/or advertising materials. Licensor's trademarks shall at all times remain the exclusive property of Licensor and, where appropriate and as instructed by Licensor, shall be designated as such. This license does not give Licensee any implicit or other rights to any reproductions in any other product medium of any kind. In no event shall Licensee do anything that will adversely or negatively affect the ownership of Licensor's trademarks. Licensee acknowledges the distinctiveness, validity, and Licensor's ownership of the trademarks licensed herein and agrees that all usage of such trademarks by Licensee inures to the sole benefit of Licensor.

3. **Term.** This Agreement shall be effective as of the Effective Date and shall expire on December 31, 2014, unless otherwise stated or terminated for reasons set forth herein (the "Term"). At the conclusion of the Term, Licensor will consider extending the Term of this Agreement if Licensee meets or exceeds all of the following requirements: (1) Licensee has paid all royalties due to Licensor as set forth herein; (2) Licensee has complied with all of the terms

and conditions of this Agreement; and (3) Licensee makes best efforts to proportionately sell and distribute the Licensed Products in the Approved Channels. If the Term is further extended, the parties shall establish minimum guaranteed royalties for the sales of the Licensed Products during such extended term.

**4. Payment of Royalties.** Licensee agrees to pay Licensor a royalty equal to 10 percent (10%) of the invoiced price, which is the price on the invoice paid by the wholesale purchaser, on net sales which are gross sales less returns and allowances authorized by Licensor in advance, of the Licensed Products. Furthermore, during the Term of this Agreement, Licensee shall pay to Licensor the following minimum guaranteed royalties in each of the of the following time periods:

| | |
|---|---|
| From the Effective Date to December 31, 2012 | $0.00 |
| From January 1, 2013 to December 31, 2013 | $100,000.00 |
| From January 1, 2014 to December 31, 2014 | $125,000.00 |

In support of this commitment, Licensee shall cause Mr. Edward Kotab and Talal Kotab to deliver a personal guaranty in favor of Licensor.

For the avoidance of doubt, the above guaranteed minimum royalties are the minimum amount required in each time period. Royalties paid above the minimum required in any particular year do **not** apply to the minimums required in any future year. In each year, however, all royalties paid by Licensee to Licensor will be applied to the guaranteed minimum royalties due for that year. If, however, the royalties paid by Licensee to Licensor during each year are less than the minimum royalties due for such year, then Licensee must pay Licensor the difference between the guaranteed minimum royalty amount and the amount of royalties actually paid for that year. Such amount shall be due with the payment required for the final quarter of each year.

Licensee shall pay Licensor royalty payments within fifteen (15) days following the end of each calendar quarter. Licensee shall make any and all royalty payments in U.S. currency. Licensee shall send any and all payments to Fender Musical Instruments Corporation, 17600 N. Perimeter Drive, Suite 100, Scottsdale, Arizona 85255; Attention: Royalty Accounting.

**5. Reports of Royalties Due.** On the fifteenth (15th) day following the end of each calendar quarter, Licensee also shall furnish to Licensor complete and accurate statements, certified to be accurate by an officer of the Licensee, showing the quantity, description, gross sales, gross units, and purchasers of Licensed Products distributed and/or sold by Licensee during the preceding calendar quarter period. Such statements shall be furnished to Licensor whether or not any Licensed Products have been sold during the calendar quarter period in which such statements are due.

**6. Business Records and Right to Audit.** Upon request, Licensee shall provide Licensor with any and all information and/or documents relating to the manufacturing, sourcing, advertising, marketing, distribution, and/or sale of the Licensed Products. Licensee shall keep full and accurate books and accounts relating to the manufacturing, sourcing, advertising, marketing, distribution, and/or sale of Licensed Products under this Agreement. Licensor, by its

duly appointed agent, shall have the right to examine such books during normal business hours upon not less than ten (10) business days' prior written notice. In the event that any inconsistencies or mistakes are discovered, Licensee shall immediately rectify them and make the appropriate payments within five business (5) days of notice from Licensor, provided that if such mistakes resulted in underpayments to Licensor of five percent (5%) or more, Licensee also shall reimburse Licensor for the reasonable costs and expense incurred in conducting the audit.

**7. Copyright, Trademarks and Other Intellectual Property.** Licensor is and shall remain the sole owner of all trademarks, trade dress, domain names, and any other intellectual property rights related to the trademarks licensed to Licensee by Licensor. Nothing in this Agreement shall be deemed to grant Licensee any rights except for those rights specifically set forth in this Agreement. The use of the Licensor's trademarks by Licensee shall in no way be deemed or considered to have transferred any ownership interest in such intellectual property to Licensee. Licensee warrants and represents that it shall notify Licensor of any infringing use of Licensor's trademarks and/or copyrights by any third party and shall provide assistance and cooperation to Licensor in connection therewith. Licensor shall have the right, but not the obligation, to bring legal action against anyone adversely affecting Licensor's intellectual property. Licensee further represents and warrants that it shall not, directly or indirectly, take any action that conflicts with or adversely impacts Licensor's rights to any of Licensor's intellectual property, including, but not limited to, the intellectual property licensed to Licensee herein. Licensee shall not include any artwork in the Licensed Products that is not owned by Licensor or created by Licensee, unless approved in advance and in writing by Licensor.

**8. Quality.** Licensee agrees that (i) the Licensed Products sold by it shall be of such style, appearance and quality as approved by Licensor and as to be suited to Licensor's best advantage and to the protection and enhancement of its trademarks, copyrights and goodwill pertaining thereto; (ii) the Licensed Products distributed and sold by Licensee shall be manufactured, marketed, distributed, and sold in accordance with all applicable state, federal, and local laws and regulations; and (iii) Licensee's policies of sale, marketing, and distribution of Licensed Products shall be of a high standard. In particular, Licensee agrees that none of the Licensed Products will be basic blanks. In addition, all the Licensed Products will be highly detailed, and with the exception of printed shirts, will contain embroidered designs, patches, offset stitching, and other similar design features, and whenever possible, will include fine finishing touches, including, but not limited to, Fender customized buttons, snaps, zipper pulls, offset color piping, and other similar design features.

Licensee further agrees that it shall not source the Licensed Products from any third party or otherwise use any third party in the creation, design or manufacture of the Licensed Products unless and until Licensor approves such third party in advance and in writing. Licensee further agrees that in the event Licensor approves such third party, as set forth herein, Licensee shall take any and all actions, as requested by Licensor or otherwise, to protect Licensor's rights to the intellectual property licensed to Licensee herein and to ensure that such third party complies with the terms set forth in Section 9 herein.

**9. Samples and Licensor's Approvals.** Prior to displaying, selling or advertising any Licensed Products, Licensee shall furnish to the designated representative of Licensor set forth in

Section 18 herein for Licensor's approval, which shall not be unreasonably withheld, samples of each new Licensed Products (a "Pre-Sale Sample") and any and all catalogues or other marketing materials. Licensee can send Licensor CAD files or artist renderings of the Licensed Products for approval, as long as the Licensed Products reflect the CAD files or artist renderings approved by Licensor and as long as Licensee provides Licensor with an actual sample of the Licensed Product(s) when requested by Licensor. Any Pre-Sale Sample or materials submitted by Licensee, received by Licensor's designated representative, and not disapproved by Licensor in a written notice sent to Licensee within thirty (30) days after Licensor's designated representative's receipt of such item shall be deemed to have been approved by Licensor. Any Pre-Sale Sample or marketing materials disapproved by Licensor may not be used for any purpose by Licensee or any third party. From time to time after Licensee has commenced selling any Licensed Products, Licensor may request and Licensee shall provide to the designated representative of Licensor set forth herein, at no cost, additional random samples of each Licensed Products and/or marketing materials being sold or used under this Agreement. In the event Licensor determines in its reasonable discretion that there is a material departure from the approved Pre-Sale Sample of any such item, Licensor shall have the right, by written notice given to Licensee, to revoke Licensor's approval of such item. In such event, such Licensed Products and/or marketing materials may not be used by Licensee or any third party for any purpose.

Licensee may only use manufacturers approved in advance and writing by Licensor to manufacture the Licensed Products. Breach of this provision shall constitute a material breach of this Agreement and entitle Licensor to immediately terminate this Agreement.

Licensee agrees that Licensor shall be the exclusive owner of all designs and artwork that incorporate Licensor's trademarks and Licensor shall have all rights therein, including, without limitation, the rights to reproduce, distribute or prepare derivative works therefrom. Licensee assigns to Licensor all rights it may have in such designs or artwork. Any designs or artwork developed by Licensee or its assigns shall be deemed to be work for hire and shall be owned by Licensor. To the extent, if any, the designs or artwork are deemed not to be a "work for hire" with the meaning of Sections 101 and 201(b) of The Copyright Act of 1976, Licensee and its assigns hereby assigns, transfers, and conveys to Licensor all of the exclusive rights comprised in the copyright for the designs and artwork as fully delineated in Section 106 of The Copyright Act, as well as any actions, lawsuits or claims of copyright infringement of the images. Licensee agrees to execute any and all necessary paperwork to evidence Licensor's ownership of such designs and/or artwork, including, but not limited to trademark or copyright applications.

**10. Product Credit; and Right to Purchase.** During each year of the Term of this Agreement, in addition to any Licensed Products provided to Licensor as part of the approval process under Section 9 of this Agreement, upon request, Licensee will provide to Licensor, or its designee, 6 of each item of Licensed Product produced and stocked free of charge, , with shipping costs for such Licensed Products to be paid by Licensor or its designee. In addition, Licensor shall have the right, subject to availability, to purchase Licensed Products directly from Licensee, at ten percent (10%) above Licensee's lowest standard cost, and to advertise and sell such Licensed Products through Licensor's and/or its subsidiaries', affiliates' and distributors' online stores or other outlets. Licensee shall not have to pay Licensor a royalty on such items.

For purposes of this Agreement, standard cost shall mean the landed cost to Licensee for the Licensed Products before any operational expenses or other allocations.

**11. Termination.** (a) Either party may terminate this Agreement in the event of a material breach of this Agreement. In the event Licensor terminates the Agreement in accordance with this provision, Licensee shall not be entitled to exhaust its remaining inventory of Licensed Products, as set forth in section 11(c) herein, or otherwise use any of Licensor's intellectual property without Licensor's advance, written consent. In the event Licensor terminates the Agreement in accordance with this provision, Licensor shall have the right to have Licensee recall all Licensed Products at Licensee's expense.

(b) The following, without limitation, shall constitute a material breach by Licensee: (i) if Licensee becomes insolvent or has cash flow or other financial restrictions that impact Licensee's ability to adequately perform the services set forth herein; (ii) if Licensee files a petition in bankruptcy or for reorganization; (iii) if any insolvency proceedings are instituted by Licensee; (iv) Licensee fails to timely pay Licensor royalties two times or more during the Term; or (v) Licensee fails to pay the guaranteed minimum royalties set forth in section 4 above.

(c) Except as set forth in sections 11(a) and (b), at the expiration and/or other termination of this Agreement, Licensee shall immediately discontinue all use of Licensor's trademarks and/or copyrights, including the promotion, distribution and sale of the Licensed Products, provided, however, that Licensee may sell or have sold the Licensed Products that are in its then current inventory for a period of ninety (90) days thereafter, subject to continued compliance with the terms of this Agreement, including the royalty payments set forth in Section 4, during that period. In such event, Licensee agrees to notify Licensor of its strategy to exhaust its remaining inventory of Licensed Products and to avoid dumping or selling Licensed Products to retailers such that it negatively affects Licensor's brands. After that period, neither Licensee nor its receivers, representatives, trustees, agents, administrators, successors and/or assigns, shall have any rights to sell, exploit, or in any way deal with or deal in Licensed Products, including existing inventory, or any carton, packaging or wrapping material, advertising promotional or display material pertaining to Licensed Products. In the event the Agreement is terminated for any reason, all payments not yet paid by Licensee to Licensor shall become due and payable immediately to Licensor, including, but not limited to, the guaranteed minimum royalties required through the end of the original Term of the Agreement.

**12. Indemnification and Release of Liability.** Licensee shall be liable for and indemnify and hold harmless Licensor, its subsidiaries, affiliates, officers, directors, shareholders, agents or employees for any losses, damages, claims and expenses arising out of a breach of any obligation or representation of this Agreement by Licensee, and/or any liability relating to the manufacture, advertisement, promotion, distribution, sales, consumer use or purchases of the Licensed Products. Licensee shall also be liable for and indemnify Licensor for the tarnishment or dilution of Licensor's licensed trademarks and/or brands caused by Licensee's conduct or lack of conduct. In no event shall Licensor or its subsidiaries, affiliates, officers, directors, shareholders, agents or employees be liable at any time to Licensee or anyone else for any damages, including indirect, special, incidental, consequential, or exemplary damages, or for any fines, penalties or other assessments arising out of the production, distribution, sale,

performance or use of any of the Licensed Products, whether due to breach of contract, breach of warranty, negligence, trademark infringement of marks other than Licensor's licensed marks or otherwise. This includes, but is not limited to, any QA (Quality Assurance) and QC (Quality Control) issues related to the assembly or manufacture of the Licensed Products and any intellectual property claims related to Licensee's use of names, designs, artwork or marks other than Licensor's licensed marks. To the extent that the Licensor seeks enforcement of this provision, or otherwise seeks recovery of damages or other legal remedy (in equity or at law) arising out of or relating to this Agreement, Licensor shall have control of the defense of any claims and Licensee shall be liable for immediate payment of any and all reasonable legal fees, costs and expenses incurred by the Licensor as a result of pursuing such activities. This indemnification provision shall survive any termination of this Agreement. Licensee agrees to maintain insurance coverage in a minimum amount of $3,000,000US for any and all product liability, general liability and intellectual property claims arising out of and/or relating to the Licensed Products that may be brought against Licensor or its subsidiaries at any time, to add Licensor and/or its subsidiaries as an additional insured on such insurance policies, and to provide Licensor with a copy of such action. Licensee must notify Licensor if the policy expires or changes.

     **13. Agency Disclaimer.** This Agreement does not make or appoint, and nothing contained herein shall be construed to make or appoint, either party thereto an agent of the other for any purpose, or either party hereto liable for any debts, liabilities or obligations of the other, unless otherwise agreed to herein, either now existing or to be incurred on the performance of this Agreement, and neither party shall have any authority to bind or obligate the other in any manner whatsoever.

     **14. Representations and Warranties.** Licensor represents and warrants that it has full corporate power and authority to enter this Agreement and perform its obligations hereunder and the execution of performance of this Agreement has been duly authorized. Licensor makes no warranty that Licensee will be successful in the production, distribution and/or sale of any Licensed Products or will achieve any particular rate, cost or quality of production.

     **LICENSOR'S FOREGOING WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

     Licensee represents and warrants that (i) it has full corporate power and authority to enter this Agreement and perform its obligations hereunder and the execution of performance of this Agreement has been duly authorized; (ii) the performance of its obligations under this Agreement will not violate or conflict with the terms of any other agreement to which Licensee is a party or by which it is bound; (iii) neither it nor its third party manufacturers, vendors or affiliates are using or will use any child labor in the production, sale or distribution of the Licensed Products, and Licensee will periodically report to Licensor its investigations of and compliance with this requirement; (iv) it shall abide by all applicable trademark and copyright laws and sound practices in regard to trademark and copyright notice provisions and that it shall apply such notice to the products' packaging; (v) it shall use the ™ or other appropriate symbol

in conjunction with Licensee's use of Licensor's trademarks and copyrights consistent with such instructions as Licensor may from time to time give to Licensee; (vi) it will employ or contract with sales people for the Licensed Products, it shall maintain its own sales team for the Licensed Products, and it shall participate in, and shall bear applicable, reasonable costs and expenses in relation to, the MAGIC show or other relevant industry trade shows at least twice a year displaying Licensed Products all at its own cost; (vii) it will develop marketing and advertising programs reasonably acceptable to Licensor for the Licensed Products, (viii) it will launch the Licensed Products described on **Schedule E** in the time periods noted on such schedule, and (ix) it shall use best efforts, at its own cost and expense, to maximize the sales of the Licensed Products during the Term of this Agreement.

15. **Governing Law.** This Agreement shall solely be governed by and construed, performed and enforced, in accordance with the laws of Arizona, United States of America. The sole and exclusive venue and jurisdiction for resolving any controversy, dispute or claim between or involving the parties to this Agreement shall be Phoenix, Arizona, pursuant to Licensor's Dispute Resolution Policy, attached as **Schedule F** or, if appropriate under Licensor's Dispute Resolution Policy, a court of competent jurisdiction located in the state of Arizona, Maricopa County. In the event of any dispute arising from the terms of this Agreement, the prevailing party in such dispute shall be entitled to recover the costs and expenses of enforcing the terms of this Agreement, including, but not limited to, attorneys' fees and the cost and expense of enforcing its rights.

16. **Force Majeure.** Neither party shall be liable for any failure of or delays in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond the party's reasonable control. Notwithstanding any provision of this Agreement to the contrary, a general slowdown in the world or local economy shall not be a force majeure for purposes of this Agreement. Each party agrees to notify the other promptly of the occurrence of any such cause and to carry out this Agreement as promptly and practical after such cause is terminated.

17. **Amendments, Waivers.** This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto or, in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement in any one or more instances, shall not be deemed nor construed as further or continuing waiver of any such condition, or of the breach of any other provision, term, covenants, representation or warranty of this Agreement.

18. **Notice.** Every notice or other writing required or permitted under this Agreement shall be in English and shall be signed by a duly authorized representative of the party initiating such notice or other writing and shall be either (a) be hand delivered to the person, position named below; or (b) sent by certified mail, return receipt requested, postage prepaid, express mail, or e-mail to the following address unless changed by written notice of the party in question.

> For Licensor:   Fender Musical Instruments Corporation
> 17600 N. Perimeter Drive, Suite 100

Scottsdale, AZ 85255
Attn: Mark D. Van Vleet
(480) 845-5450 (direct)
mvanvleet@fender.com

For Licensee: Dragonfly Clothing Company
1275 N. Patt Street
Anaheim, CA 92801
Attn: Mr. Talal Kotab, President
__714·447·0027__  (direct)
__eddiedf@live.com__ (e-mail)

19. **Assignment.**  This Agreement is not assignable or otherwise transferable, in whole or apart, by any party, whether by way of assignment, operation of law or otherwise, without the prior written consent of the other party.

20. **Section and Paragraph Headings.**  The section and paragraph headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

21. **Partial Validity and Severability.**  All rights and restrictions contained herein may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws and are intended to be limited to the extent necessary to render this Agreement legal, valid and enforceable.  If any term of this Agreement, or part thereof, not essential to the commercial purpose of this Agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, it is the intention of the parties that the remaining terms hereof, or part thereof, shall constitute their agreement with respect to the subject matter hereof and all such remaining terms, or parts thereof, shall remain in full force and effect.  To the extent legally permissible, any illegal, invalid or unenforceable provision of this Agreement shall be replaced by a valid provision that will implement the commercial purpose of the illegal, invalid or unenforceable provision.

22.    **Counterparts.**  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be as effective as delivery of a manually executed counterpart hereof.

23.    **Entire Agreement.**  This Agreement, together with any attachments hereto, all of which are incorporated herein by reference and made a part of this Agreement, constitutes the entire agreement between Licensor and Licensee and supersedes all proposals, oral and written, and all other communications between the parties in relation to the subject matter of this Agreement.  Except as otherwise provided herein, no variation of this Agreement shall be effective until reduced to writing and executed by the parties hereto.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed and do hereby warrant and represent that their respective signatory, whose signature appears below, has been and as of the date of this Agreement, duly authorized by all necessary and appropriate action to execute this Agreement.

**FENDER MUSICAL INSTRUMENTS**          UMERCO CLOTHNG INC.
**CORPORATION**                          DBA DRAGONFLY CLOTHING

By:_____             By:_____
Name: Mark Van Vleet                     Name:  Talal Kotab
Title: Secretary/CLOTitle:  President

**SCHEDULE A**

TERRITORY

Worldwide, <u>except</u> Japan

## SCHEDULE B

### LIST OF TRADEMARKS AND BRANDS

- FENDER™
- *Fender* ™
- *Fender* ™
- TELECASTER™
- STRATOCASTER™
- PRECISION BASS™
- JAZZ BASS™
- THE SPIRIT OF ROCK-N-ROLL™
- the distinctive body and headstock designs of the TELECASTER,  STRATOCASTER, PRECISION BASS, and JAZZ BASS  guitars
- Any other Licensor trademark that Licensor authorizes in advance and in writing.

**SCHEDULE C**

APPROVED CHANNELS

- Channels of Distribution:

- Specialty (Such as: Buckle, Fred Segal, Kitson, Urban Outfitters, Hot Topic, Hard Rock Café, Hard Rock Hotels, and House of Blues).  <u>Excludes: Novelty retailers such as Spencers Gifts and</u> music retailers such as Guitar Center.

- Top-Tier Department Stores (such as:  Bloomingdales, Lord & Taylor, Macy's, Niemen Marcus, Nordstrom, Saks Fifth Avenue, and Barney New York)

- Boutiques (such as: Kitson, Fred Segal and H. Lorenzo)

- Specifically excludes Mass-Market retailers and Mid-Tier retailers (such as Sears, JCP and Kohl's)

## SCHEDULE D

### LICENSED PRODUCTS

- Shirts (woven, microfiber)
- Outerwear (zipper hoodies, work jackets, leather jackets, leather vests, leather/fabric hybrid, sweaters)

**SCHEDULE E**

LAUNCH SCHEDULE

At a minimum, Licensee must launch at least 1 of each of the following products in the following periods (products not launched during the scheduled launch periods may be removed from the definition of Licensed Products at the discretion of Licensor):

2013

Long sleeve basic embroidered (plaid or solid style) shirt
Embroidered work wovens (1 basic, 1 bowling style panel) shirt
Print microfiber shirt
Special forces style sweater
Embroidered work jackets
Embroidered hoodies
Embroidered ¾ length jacket (Navy P coat style)
Embroidered sport jacket

2014

Winter weather hoodie
Leather jacket
Leather fabric hybrid sweater jacket
Embroidered leather vest

**SCHEDULE F**

FENDER MUSICAL INSTRUMENTS CORPORATION
DISPUTE RESOLUTION POLICY

If a dispute arises between the parties, it is expected that the parties will attempt in good faith to resolve any such dispute in an amicable and mutually satisfactory manner.

In the event such efforts are unsuccessful, either Party may serve a notice of mediation/arbitration ("Notice of Mediation/Arbitration") on the other Party. Notice of Mediation/Arbitration shall be personally delivered or sent by prepaid registered airmail, air courier of facsimile, and shall be effective on receipt thereof by the Party to whom it is addressed. Proof of receipt shall be a receipt signed by any officer or responsible official of the Party to whom it is addressed. The Notice of Mediation/Arbitration shall be dated, and without prejudice to any right under the Rules permitting subsequent modifications, shall specify the claims or issues that are to be subjected to mediation/arbitration.

IF DIFFERENCES CANNOT BE RESOLVED BY MEDIATION THE PARTIES AGREE THAT IN ORDER TO PROMOTE TO THE FULLEST EXTENT REASONABLY POSSIBLE A MUTUALLY AMICABLE RESOLUTION OF THE DISPUTE IN A TIMELY, EFFICIENT AND COST-EFFECTIVE MANNER, THEY WILL WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY AND SETTLE THEIR DISPUTE BY SUBMITTING THE CONTROVERSY TO ARBITRATION IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("A.A.A") EXCEPT THAT ALL PARTIES SHALL BE ENTITLED TO ALL DISCOVERY RIGHTS ALLOWED UNDER THE FEDERAL RULES OF CIVIL PROCEDURE AS THOSE RULES EXIST IN THE UNITED STATES FEDERAL COURT FOR THE DISTRICT OF ARIZONA.

The Parties shall attempt to select a mutually agreeable mediator/arbitrator from A.A.A.'s Panel of Mediators/Arbitrators. If no agreement is reached within fifteen (15) days of the first written notice of intent to mediate/arbitrate, the current Director of Professional Services for A.A.A. in Arizona shall serve as the mediator/arbitrator.

The Arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §1, *et. seq.*, and the judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. Either Party may elect to participate in the arbitration telephonically. Any substantive or procedural rights other than the enforceability of the arbitration agreement shall be governed by Arizona law, without regards to Arizona's conflict of laws principles.

The Parties further expressly agree that (i) the arbitrator shall only reach his decision by applying strict rules of law to the facts, (ii) the arbitration shall be conducted in the English language, in Maricopa County, Arizona, (iii) the Party in whose favor the arbitration award is rendered shall be entitled to recover costs and expenses of the arbitration including, but not limited to, attorneys' fees and the cost and expense of administration of the arbitration proceedings, and any

costs and attorneys' fees incurred in executing on or enforcing the arbitration award, and (iv) the arbitral award shall be issued in Maricopa County, Arizona, U.S.A.

Except as provided in the following sentences, no party shall be entitled to commence or maintain any action in a court of law upon any matter in dispute until such matter shall have been submitted and determined as provided herein and then only for the enforcement of such arbitration award. Provided that, notwithstanding this dispute resolution policy, either party may apply to a court of competent jurisdiction in Maricopa County, Arizona, to seek injunctive relief before or after the pendency of any arbitration proceeding. The institution of any action for injunctive relief shall not constitute a waiver of the right or obligation of any party to submit any claim seeking relief other than injunctive relief to arbitration. Judgment upon the award may be entered by the United States Federal District Court or Maricopa County Superior Court located in the State of Arizona, or application may be made to such court for the judicial acceptance of the award and order of enforcement, as the case may be, if the Arbitrator's award or decision is not complied with within seven (7) days of the Arbitrator's decision.

Arbitration shall be the sole and exclusive procedure for resolution of disputes between the parties, including any disputes that might arise after termination of this Agreement.

# EXHIBIT C

### FIRST AMENDMENT TO THE
### FENDER MUSICAL INSTRUMENTS CORPORATION
### AND UMERCO CLOTHING INC. DBA DRAGONFLY CLOTHING
### LICENSE AGREEMENT

This First Amendment to License Agreement (the "Amendment"), effective as of September 12, 2013, is made to the License Agreement dated September 6, 2012, between Umerco Clothing Inc. dba Dragonfly Clothing ("the "Licensee") and Fender Musical Instruments Corporation (the "Licensor").

NOW, THEREFORE, in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   Dragonfly Clothing wishes to transfer their obligations under the License Agreement to American Garmento Incorporated, located at 1275 N. Patt St., Anaheim, CA 92801.  Licensor agrees to the transfer of the License Agreement from Dragonfly Clothing to American Garmento Incorporated as required under Section 19 of the License Agreement. The parties agree that the definition of "Licensee" shall now be American Garmento Incorporated. Further, notwithstanding any provision in the agreement to the contrary, the personal guarantees in favor of Licensor made by Messieurs Edward Kotob and Talal Kotob will remain in full force and effect.

2.   Except as expressly set forth herein, the Agreement shall not be deemed to have been modified or amended hereby and the parties hereby ratify and confirm the Agreement as amended in all respects.   In the event of any conflict between the Agreement and this Amendment, this Amendment shall control.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Amendment as of the date first written above.

UMERCO CLOTHING INC.
DBA DRAGONFLY CLOTHING

By: _____

Its: President


FENDER MUSICAL INSTRUMENTS
CORPORATION

By: _____

Its: _____


AMERICAN GARMENTO INCORPORATED

By: _____

Its: CFO

# EXHIBIT D

## PERSONAL GUARANTY

THIS GUARANTY is made and entered into this 6th day of September, 2012, by and among Edward Kotab, whose residential address is 7495 Hummingbird, Anaheim Hills, CA 92807, and Talal Kotab, whose residential address is 7495 Hummingbird, Anaheim Hills, CA 92807 (collectively, the "Guarantor") in favor of Fender Musical Instruments Corporation, a Delaware corporation, having a principal place of business at 17600 N. Perimeter Drive, Suite 100, Scottsdale, AZ 85255 (hereinafter called "FMIC").

This Guaranty is made with reference to the following facts, which Guarantor acknowledges to be accurate and complete:

1.     Dragonfly Clothing Company (herein called "Licensee") is a corporation organized and existing pursuant to the laws of the State of California, having a principal place of business at 1275 N. Patt St., Anaheim, CA 92801.

2.     Licensee desires to enter into a License Agreement with FMIC.

3.     The Guarantor is the principal owners of Licensee, and has been and/or will be substantially benefited by FMIC's willingness to transact business with Licensee.

4.     In consideration of FMIC's willingness to transact or continue to transact business with Licensee and/or its successor(s) in interest, FMIC requires guaranty of the undersigned covering the liabilities of Licesnee as hereinafter defined.

NOW THEREFORE, for the good and valuable consideration and as an inducement to FMIC to transact business with Licensee, the parties hereto agree as follows:

1.     Guarantor hereby unconditionally and irrevocably guarantees to FMIC full and prompt payment of all liabilities of Licensee to FMIC of whatever nature, whether now existing or hereafter incurred, whether matured or unmatured, whether arising out of such business or otherwise, and whether absolute or contingent (all of which liabilities are hereinafter collectively referred to as "Liabilities of Licensee").

2.     Guarantor authorizes FMIC, without notice or demand and without affecting its liability hereunder, from time to time to: (a) change or extend the time, or manner, of payment of Liabilities of Licensee; (b) change any of the terms, covenants, conditions, or provisions of the documents relating to Liabilities of Licensee; (c) transfer, assign, or negotiate the terms of Liabilities of Licensee; (d) take and hold additional security or exchange or replace security; (e) apply any security and to direct the order and manner of sale thereof as FMIC in its discretion may determine; (f) proceed against Guarantor on Liabilities of Licensee without first foreclosing any security or proceeding against Licensee; (g) accept a conveyance of all or part of any security in partial satisfaction of Liabilities of Licensee and proceed against Guarantor for the balance then due thereunder; (h) release any other guarantor or any other person liable for the payment or performance of Liabilities of Licensee; (i) release any security for Liabilities of Licensee with or without notice of consideration, or; (j) consent to a sale of any property securing Liabilities of Licensee.

Personal Guaranty

3.      All monies available to FMIC for application in payment or reduction of the Liabilities of Licensee may be applied or not applied by FMIC in such amounts and at such time as FMIC may see fit to the payment or reduction of such Liabilities of Licensee as FMIC may elect.

4.      Guarantor specifically and without reservation waives:

   a.   Presentment, demand, protest, notice of protest, notice of dishonor, notice of non-payment, notice of default, notice of foreclosure or of any public or private sale, and notice of acceptance of this Guaranty;

   b.   The right, if any, to the benefit of, or to direct the application of any security held by FMIC or to require the marshaling of assets; and, until Liabilities of Licensee has been performed or paid in full, all rights of subrogation, any right to enforce any remedy which FMIC now has or hereafter may have against Licensee, and any right to participate in any security now or hereafter may have against Licensee, and any right to participate in any security now or hereafter held by FMIC;

   c.   The right to require FMIC to proceed against Licensee or to proceed against any security now or hereafter held by FMIC or to pursue any other remedy in FMIC's power;

   d.   Any defense arising out of the absence, impairment, or loss of any right of reimbursement or subrogation or other right or remedy of Guarantor against Licensee or against any security resulting from the exercise or election of any remedies by FMIC, and any defense arising by reason of disability or other defense of Licensee or by reason of cessation, from any cause, of the liability of Licensee, including but not limited to the bankruptcy of Licensee;

   e.   The benefit of or right to assert any statute of limitations affecting its liability hereunder or the enforcement thereof to the extent permitted by law;

   f.   Any defense arising out of FMIC's impairment of any security; and

   g.   The right to be notified of any enforcement action or of any fact purportedly increasing Guarantor's risk.

5.      This is a guaranty of payment and not of collection, and the liability of the Guarantor on this Guaranty shall be direct and immediate and not conditioned or contingent upon the pursuit by FMIC of whatever remedies FMIC may have against Licensee or any other person or security of liens FMIC may possess.  Without limiting the generality of the foregoing, Guarantor further waives any right to require that any action be brought against Licensee or any other person or to require that resort be had to any security or liens or any balance of any account or credit on the books of FMIC in favor of Licensee or any other person, as a precondition to taking any action to this Guaranty.

6.      For purposes of this Guaranty, all references to FMIC shall be deemed to include all operating components or units of FMIC, and whether or not Licensee presently does business or has an arrangement with such component or unit of FMIC.  References to FMIC shall also

Personal Guaranty

include any successors and assigns of FMIC, in whose favor the provisions of the Guaranty shall inure. All references to Guarantor shall be deemed to include the heirs, executors, administrators, legal representatives, and successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty.

7.      No delay on the part of FMIC in exercising any right hereunder or failure to exercise any right hereunder shall operate as a waiver of such rights.   No notice to or demand on Guarantor shall be deemed to be a waiver of the obligations of Guarantor, or of the right of FMIC to take further action without notice or demand as provided herein; nor in any event shall any modification or waiver of the provisions of this Guaranty be effective unless in writing, signed by an officer of FMIC nor shall any such waiver be applicable except in the specific instance given.

8.      The right of FMIC to demand, and the obligation of Guarantor to pay, the amount of any obligation guaranteed hereunder shall not be suspended, abrogated or affected in any way whatsoever by the fact that such obligation, or any part thereof, is secured by pledge of or security interest in personal property or by a mortgage, deed of trust, or other property right in or lien upon real property.

9.      A party may be released from the obligations of this Guaranty, and this Guaranty may be amended or revoked, only in writing executed by FMIC, or by written demand of Guarantor upon presentment of evidence satisfactory to FMIC that Liabilities of Licensee have been fully satisfied.

10.     Guarantor acknowledges that FMIC shall not be obligated to enter into contracts with Licensee or extend credit to Licensee by reason of this Guaranty.

11.     This Guaranty is, and shall be deemed to be, a contract entered into in the State of Arizona, and this Guaranty shall, in all respects, be construed and interpreted in accordance with the laws of the State of Arizona applicable to contacts entered into and fully to be performed therein.

12.     Any indebtedness of Licensee now or hereafter held by Guarantor is hereby subordinated to the indebtedness of Licensee to FMIC; and any indebtedness of Licensee to Guarantor if FMIC so requests, shall be collected, enforced, and received by Guarantor as trustee for FMIC on account of the indebtedness of Licensee to FMIC without affecting the liability of Guarantor under this Guaranty.

13.     Guarantor agrees to pay reasonable attorneys' fees and all other costs and expenses that may be incurred by FMIC in the enforcement of this Guaranty.

14.     The provisions of A.R.S. §§ 12-1641, 12-1642, 12-1643, and 44-142, Ariz. R. Civ. Proc. Rule 17(f), or any similar statute or rule, if applicable, are waived.

15.     Any provision of this Guaranty determined to be invalid by a court of competent jurisdiction shall in no way affect any other provision hereof.

Personal Guaranty

16.     Guarantor represents that it has full right, power and authority to execute and deliver this Guaranty.  This Guaranty constitutes a valid and binding agreement of Guarantor, enforceable against it in accordance with its terms.

**GUARANTOR:**

By: _____
        Edward Kotab

By: _____
        Talal Kotab

Spousal Consent

        The undersigned, the spouse of Guarantor, hereby acknowledges that the undersigned has read and understood the terms of the foregoing Guaranty and hereby consents to bind the marital community property of Guarantor and the undersigned as if the undersigned was an original party thereto.

_____
Name: _____
Date: _____

Spousal Consent

The undersigned, the spouse of Guarantor, hereby acknowledges that the undersigned has read and understood the terms of the foregoing Guaranty and hereby consents to bind the marital community property of Guarantor and the undersigned as if the undersigned was an original party thereto.

_____
Name: _____
Date: 9 - 28 - 2012

Personal Guaranty

- 4 -

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of _Los Angeles_

On _9/5/2012_ before me, _Becky Redding, notary Publi-_
(Here insert name and title of the officer)

personally appeared _Talal Kotob_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Becky Redding_
Signature of Notary Public

BECKY REDDING
Commission # 1926872
Notary Public - California
Los Angeles County
My Comm. Expires Feb 25, 2015

(Notary Seal)

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

_____
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _1_  Document Date _N/A_

_____
(Additional information)

### CAPACITY CLAIMED BY THE SIGNER

☑ Individual (s)
☐ Corporate Officer
_____
(Title)
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  ❖ Indicate title or type of attached document, number of pages and date.
  ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

2008 Version CAPA v12.10.07 800-873-9865 www.NotaryClasses.com

STATE OF _California_ )
) SS.
COUNTY OF _LosAngeles)_

I, _M. Morales_ , a Notary Public in and for the County and State aforesaid, do hereby certify that _Kotob Ahmed eddie_, personally known to me to be the same person whose name is subscribed to the foregoing instrument, has signed, sealed and delivered the said instrument as a free act and deed, with authority to do so.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this _5_ day of _September_, 20_12_.

_M. Ma_____

Notary Public

My Commission Expires: _3/22/13_

M. MORALES
Commission # 1841504
Notary Public - California
Los Angeles County
My Comm. Expires Mar 22, 2013

Personal Guaranty

- 5 -

# EXHIBIT E



**FENDER MUSICAL INSTRUMENTS CORPORATION**

17600 N. Perimeter Drive, Suite 100 · Scottsdale, AZ 85255-5435 · U.S.A.
Tel 480-596-9690 · Fax 480-596-1384 · www.fender.com · www.kmcmusic.com

Alan Lundgren
Associate General Counsel
Direct Line: 480-845-5452
E-mail: alundgren@fender.com

January 27, 2014

**VIA FEDERAL EXPRESS
AND E-MAIL: eddiedf@live.com**

American Garmento Incorporated
1275 N. Patt St.
Anaheim, CA 92801
Attn: Mr. Talal Kotob

Mr. Edward Kotob
Mr. Talal Kotob
7495 Hummingbird,
Anaheim Hills, CA 92807

Re:    License Agreement with Fender Musical Instruments Corporation

Dear Mr. Edward and Talal Kotob:

This letter is written pursuant to that certain License Agreement (the "Agreement"), dated as of September 6, 2012, as amended by that First Amendment to License Agreement, dated as of September 12, 2013, between Fender Musical Instruments Corporation ("Licensor") and American Garmento Incorporated ("Licensee") and pursuant to that certain Personal Guaranty (the "Guaranty"), dated as of September 6, 2012, made by Messieurs Edward Kotob and Talal Kotob in favor of Licensor. Copies of the Agreement and the Guaranty are attached for your reference. Capitalized terms used in this letter and not defined shall have the meaning given to such terms in the Agreement or the Guaranty.

Pursuant to Section 4 of the Agreement, Licensee was obligated to pay minimum guaranteed royalties of $100,000 to Licensor by January 15, 2014 (the "Due Date") for the period January 1, 2013 to December 31, 2013. Prior to the Due Date, Licensee had paid royalties to Licensor of $4,343.00 for such period. As such, $95,657.00 was due to be paid by Licensee to Licensor on the Due Date. Such amount was not received by the Due Date.

Pursuant to Section 11(a) of the Agreement, Licensor may terminate the Agreement in the event of a material breach of the Agreement by Licensee. Section 11(b) provides that the failure by Licensee to pay the guaranteed minimum royalties due in the time required by the Agreement is a material breach by Licensee. As such, Licensee is hereby notified by Licensor that the Agreement is terminated effective January 27, 2014 (the "Termination Date") because, among other reasons, Licensee failed to pay the guaranteed minimum royalties due by the Due Date.

        
         



American Garmento Incorporated
Mr. Edward Kotob
Mr. Talal Kotob
January 27, 2014
Page 2

Pursuant to Section 11(a) of the Agreement, following a termination for material breach, Licensor has the right to require Licensee to recall all the Licensed Products outstanding at Licensee's expense.   At present, Licensor shall not require the Licensed Products to be recalled.  We will, however, require a detailed summary of all outstanding inventory, including style number, size, and on-hand inventory levels.  Upon receipt of the summary, Licensor shall instruct Licensee as to how to handle such inventory.

In addition, pursuant to Section 11(c) of the Agreement, Licensee must immediately discontinue all use of Licensor's trademarks and/or copyrights as well as the promotion, distribution and sale of the Licensed Products.  Should Licensee attempt to dispose of or "dump" the Licensed Products without Licensor's express written approval, in addition to any other remedies it may have, Licensor shall pursue punitive damages against Licensee for intentional misconduct.  Furthermore, as of the Termination Date, all payments not yet paid by Licensee to Licensor are immediately due and payable, including the guaranteed minimum royalties due through the end of the original Term of the Agreement.

Pursuant to Section 1 of the Guaranty, the Guarantor unconditionally and irrevocably guaranteed to Licensor the full and prompt payment of all Liabilities of Licensee.  In addition, pursuant to Section 5 of the Guaranty, the liability of Guarantor on the Guaranty is direct and immediate and not conditioned or contingent upon the pursuit by Licensor of any other remedies Licensor may have against Licensee.  Pursuant to Section 13 of the Guaranty, Guarantor also agrees to pay the reasonable attorneys' fees and all other costs and expenses that may be incurred by Licensor in the enforcement of the Guaranty.

As such, Licensor hereby demands immediate payment of $220,657.00 in readily available funds from Licensor or the Guarantor.  In the event Licensee does not comply with the termination provisions of the Agreement set forth in the Agreement and this Letter and Licensor does not receive the $220,657.00 by Thursday, January 30, 2014, Licensor reserves the right to pursue all remedies available to it in law or in equity, including, but not limited, an injunction, punitive damages, and attorneys' fees and costs.

If you have any questions or comments regarding this matter, please do not hesitate to call me at (480) 845-5450.

Sincerely,

Alan Lundgren
Associate General Counsel
Fender Musical Instruments Corporation

cc: Brian Tedeschi

